Radcliff, J.
This is the case of a policy on the ship Minerva, on a voyage from New York.to Guadaloupe, The risks specified in the policy, are of the usual kind. There is no express warranty that the Ship was neutral; but she is stated in the policy to be an American ship, She. was captured on the voyage insured, by-a British privateer, carried to the island of Antigua, arid there libelled and condemned in. the court of vice admiralty, as a lawful prize, no reason for'the condemnation being stated in the sentence. It appears that the papers of the. ship were regular, and such as were requisite to entitle her to - the privileges of an American ship-; that theplaintiff was the owner ; that he is-a native of one of the Swiss cantons, and that, on the 2d August, 1796, lie was naturalized as an American citizen. He has abandoned to the underwriters, and claims' a total loss.
It' does not appear on what particular ground, or on,what evidence the court of admiralty proceeded. The ship’s papers were in the possession of that court; but if nothing else [*342] appeared, there could exist no circumstance *of fraud or suspicion, unless the irregularity of one of the papers, I mean the supernumerary bill of.lading, be considered as such. If it rested on that alone, (which probably arose from inadvertence or mistake,) I should'think the condemnation unjust, and that the insured, if at liberty to exa-. mine it, ought not to-be affected by it. The case still presents: three questions to be' determined.
1. Whether the expression contained in the policy, nam *413 ing her the American ship Minerva, amounts to an implied warranty of that fact ? • „
2. Whether the sentence of the court of. admiralty is to be considered as proceeding on the ground of her not being neutral property ?
3. Whether proceeding on that ground, the sentence is to be deemed conclusive against the plaintiff.
On the first point, 1 Can entertain no doubt. It was evidently material to the risk, whether the ship Was American, and, therefore, a neutral ship; and a representation of that fact, whether in the policy or otherwise, if untrue, must discharge the underwriter. It is a fact resting in the knowledge of the insured, for which he ought to be responsible. (Saloucci v. Woodmans, Park, 362.) Being inserted in the policy, it becomes a part of the written agreement, and effectually concludes him if he cannot maintain it.
As to the second • question, I think the sentence is to be considered as proceeding on the want of neutrality. Its silence will not authorize a different conclusion. Enemy property forms the general ground of condemnation. If founded on a special or different ground, it would probably have been stated, or might be made to appear from the libel, or the proceedings upon it, to which it must have referred. No other being shown, an extraordinary cause of condemnation cannot be presumed. This interpretation of silent sentences, was adopted in the case of Saloucci v. Woodmass, and appears to be natural and just.
The third question has already been determined _ against the insured, in the case of Ludlow v. Dale, (ante, p. 16,) and I consider it unnecessary to review that decision.
T am, therefore, of opinion, that the plaintiff ought [*343] not to recover.
Kent, J.
The ship insured in this case was described in the policy, as the American ship Minerva. She was captured-in the prosecution of her voyage by a British ship of war, and carried into the island of Antigua and condemned.as lawful prize.
Several questions arise upon this case;
*414 1. • Whether the above description amounts to a warranty that the ship was American property.
2. If it'does,'then whether the condemnation js evidence of a breach of it. . ■ ■
3. If it does not, then,whether* the facts in the case do-no.t prove a deviation to have taken place in the. course of .the voyage. . . . * .-
There are no precise words which have been held requisite to create a warranty. It is a written declaration upon the face of the policy, of .a, fact in respect to the subject inr sured. A naked insertion in the margin of a policy of these words, “ thirty seamen besides passengers,” has been adjudged to amount to a warranty. (Doug. 10:)' If the word American had been written in the-margin of the policy against the name of the ship,, it must have been equally operative with the words “ thirty seamen.” They are equally allegations of a fact relative' to the subject which the insured ought to be held equally to prove. The word American, cannot have less force for. being incorporated with the description of the ship in the body of the policy, than if it stood solitarily in the margin. Allegations; of this kind may, perhaps, attract more or less attention according to then* position in the instrument. .But in the construction of written contracts we are to pre-sume that the attention of the parties has been alive and active- throughout .the- whole instrument, and that no averments are any where inserted without meaning arid without use.
The ship was captured on the high seas, and condemned aS lawful prize.She could not have been lawful prize, except upon the ground that she was not an American ship, or that she had in -some manner forfeited her immuni[*344] ties *as such, and in either case, if such was the fact, ■' the-warranty was not fulfilled.. (7 Term Rep. 705',) And that this must have been the case, I considered- as conclusively proved by -the .sentence of condemnation in the court of vice-admiralty. The conclusive effect of such sen-ten ties was'admitted and declared by this court in the case of Ludlow v. Dale, in January term, 1799 ; (an-te/p. 1,6,) arid álthough the merits, of the question there decided, have been *415 permitted to' bé re-considered and re-argued in this cause, I still'think the decision to be sound. " The true principle of law is. that where a fact has been litigated- and decided by a court hawing jurisdiction of the case', and has become a yes judicata, that decision will conclude the parties, and each of them, in all other courts, and for this reason, that the point is decided by a court of competent authority.
I cannot believe in the suggestion made upon the argument, that this principié, which appears to be deeply engrafted into eatih of the systems of English jurisprudence, (Str. 733 ; 2 Wood. 455; 7 Term Rep. 523, 681; 2 Ersk. Inst, 735; 2 Kaimes’Eq. 366,) has, as it respects the sentences of foreign courts, been moulded and extended from reasons of state, or in furtherance of their-particular interests as a commercial nation.. The dignified character of their .courts of justice, (I speak of their higher courts of law and equity) which have maintained their integrity, and protected right to a degree never before witnessed in the history of civil society, is sufficient to repel the force of such an unfounded insinuation. Nor indeed is the {doctrine peculiar to the English law. It. constitutes an important item in the Code of public law; and is sanctioned by the usage and courtesy of nations; this leads me to a new and more interesting view of the question.
If the subjects of one government be aggrieved by Unjust judgments in'the courts of another, it is not a case of judicial redress. The party aggrieved ought first to seek relief by appeal to the courts of review in the last resort, and if justice be still denied him, he must then lay his case before the sovereign of his own country. The injury *be- [*345] comes a.concern of his government, and a ground of national interference, and eventual reprisal. But the case of public interference, as Grotius observes, (1. 3, c. 2, § 5,) must be “ in re minvme dubia et plane contra jus for in all. dubious cases, the presumption is in favor of the judgment. Gronovius (ibid.) confirms this doctrine, and observes, that where there is not manifest injustice, the judges are to be regarded as honest men, and their judgments as truth, ubi non • est manifesto injustitia judices habentur pro bonis viris, ut *416 judicatura pro veritáte. The same doctrine is advanced by Vattel, (1. 3, § 84, 85.) and Martens, p. 104, 105, and by the English judges, in their answer to the memorial of Prussia j they all express themselves in a very emphatic manner, as to the definitiveness of the decisions of foreign tribunals having competent jurisdiction. An important distinction prevails upon this subject both in Great Britain and upon the Continent, and it ought to be kept in view in all the discussions upon the question. No sovereign is obliged to execute within his dominions, a sentence rendered out of it, and if such execution be sought by a suit upon the judgment, or otherwise, he is then at liberty in his courts of justice to examine into the merits of such judgment. And yet in the case of a suit to obtain the effect of a foreign judgment, the rule is, that the judgment shall be presumed right* and it shall lay with the opposite party to show cause against it. But if a judgment has been pronounced and carried into effect by a competent forum, no foreign court will admit of a fresh litigation, at the instance of either party, upon a fact once in issue and decided. The plea of the foreign judgment will be a bar to the second action. The action is excluded by what is termed by civilians exceptio rei judicatce. (Martins’ Law of Nations, 105. Ersk. and Kaimes’ ut supra. Doug. 1, and Galbraith v. Neville, cited in addenda to Doug.)
In the present case, the question now raised, whether the Minerva was an American ship, was the very ques-[*346] . tión raised, *and decided against the present plaintiff, by the court at Antigua. He was a party to that suit,, and ■ had, by himself, or his agent, due notice and due opportunity to make his- defence. That court had the competent jurisdiction to try the question, and the party is bound by its sentence, with a reservation of his right of appeal. If he does not appeal, he must be considered as acquiescing in the justice of that sentence.- We are to regard it.as the evidence of truth, res judicata pro veritate accipitur. The peace of society, the interests of national intercourse, mutual . urbanity, and the necessity that litigations should cease, renders the rule as salutary as it is extensive.
*417 But if the court were now to depart from its former decision on the question, there is another ground to be taken in this case, and which I apprehend to" be sufficient to prevent a recovery. The ship had contradictory papers on board, and that fact was a sufficient cause for bringing the vessel in for adjudication. . These contradictory and colorable papers, I admit and believe, originated in the mistake of the plaintiff; but insurers are not liable for dosses arising from mistakes of the owner or master. A laches oí the plaintiff if it be the cause of a seizure, will avoid the policy, as for A deviation. .These papers, I also admit, were susceptible of explanation ; but in the moment and hurry of detention and inspection on the high seas, dum fervel opus, there is not leisure for an accurate examination of contradictory papers, and the belligerent is perfectly justifiable in sending in the vessel for a judicial inquiry. This departure of ,the vessel from her regular course is not a justifiable deviation, provided the vis major by which it was produced, proceeded from the neglect of the owner.- And as in this case, the contradictory papers which justified the seizure, proceeded from the want of due attention in the plaintiff, he must be considered. as the cause of that seizure and deviation, and he has thereby discharged the insurer.
I am accordingly of opinion, that the defendant is entitled to judgment.
*Benson, J., concurred in the opinion, delivered [-*347] by Kent, J., on the last point, and that the defendant was, therefore, entitled to judgment. He gave no opinion on the other points.
Lewis, J. Two questions arise in this cause.
1. Whether the terms American ship, applied to the Minerva in the policy of insurance, amounts to a warranty 1
2. If it does, is her condemnation, in- a prize court of a belligerent power, conclusive on the question of neutrality ?
All contracts are to be construed according to the intent of the contracting parties, so as to give complete effect to such intent, if it may be done, consistent with the rules of law. The contract of insurance is to be most liberally ex *418 pounded for the attainment of this end. The first inquiry then is, whether the words American ship amount to a war-' ranty within the meaning and intention of the parties. To constitute a warranty, the stipulation must be. on the face of the policy, but it does not thence result, that every assertion there found is a Warranty. There appears tó, me a clear distinction,-between terms intending to designate with precision the subject matter of the contract, and those which form an express warranty or condition. The one constitutes a substantive ground of insurance, the other is a mere quality of the subject, inserted for the sole purpose of identification. Their effects also are variant; for while the one, perhaps, ought. to be construed most rigorously against the party-bound 'by it, and therefore, to be true, in the most extensive latitude in which the contract can be affected by it, it shall, in regard to the other, be taken to be true in its most simple and common sense.- Thus, where a ship is expressly warranted American, the construction shall be, that sheds warranted as entitled "to. all the privileges of neutrality.—But where, in the ordinary part of the policy, among her distinguishing qualities, she is istyled American, if she is so, in the ordinary acceptation of the term, and in common [*348j understanding, *it shall suffice.. This construction is. not repugnant to the rules of law, and it only remains to ascertain the intent and meaning of the parties, ' which, in every case, must be drawn from the particular circumstances. In the present case, we find t-he expression, connected with,, and standing among the descriptive terms of the subject. It is not inserted in the mode in which the defendants are accustomed to introduce warranties. We-are to suppose that, it produced no deduction from the ordinary rate .of insurance'; for if it had, the underwriters would undoubtedly have shown it, and this would have been conclusive as to the intent. . It may be likened to the: case of estoppels: a particular: recital or averment shall estop, a' general recital shall not, as in the case of Skipwith v. Green, (8 Mod. 311,) calling lands meadow, in a lease, shall-not estop, but the party may show them" to be arable, in the *419 policies on the goods also, which are to a greater value than that on the ship, there is no warranty, which is an additional circumstance explanatory of the intention of the parties.
The commercial law of most nations is adjusted to the principles of théir peculiar policy. America, growing into commercial importance, should not be inattentive to this fact. And as the business of insurance will soon become to her an important commercial object, by reason of foreigners procuring policies to be effected here, it is of the highest importance to preserve the strictest good faith, to show as little disposition to cavil, and to raise as few difficulties in the adjustment of these contracts,, as we feel ourselves bound to do in our other foreign engagements. I can find no British law which impugns the distinction I have stated ; the case of Bean and Stupart, Doug. 10, is by no means against it. For the insertion there in the margin, purported to be a warranty, from the very manner of its introduction.
I might rest my opinion on this single point; but as the other is of great importance, and as it is stipulated that either party may turn the case into a special verdict, it *may be desirable that an opinion should also be [*349] expressed on the other question.
How far the sentence of a foreign court shall be conclusive upon the parties to a contract of insurance, in deciding a question of neutral property, is an interesting inquiry. The British adjudications do not, in my Opinion, place the question out of doubt. In Barzillay v. Lewis, (Park, 360,) Lord Mansfield observes, that no nation is bound by the particular regulations of belligerent powers, unless they are agreeeable to. the general laws of nations, but that all third persons and mercantile people are, and that the assured, by his warranty, takes the knowledge of the circumstances on himself. In Easter, term following, in the case of Mayne v. Walter, (Park, 195,) he declares a particular ordinance of France arbitrary and oppressive, contrary to the laws of nations, and as both parties were ignorant of it, the underwriter, must run all risks. (Park, 365.) In ' Saloucci v. Johnson, Mr: Justice Buller declares, that a ship is only bound to take notice of *420 the laws of the country she sails from, and of that to which she sails; but not of the particular ordinances of other powers. . These' opinions are, to me, contradictory and irreconcileable, and nothing conclusive can be inferred from them. If we resort to writers on the law of nations, the only authority which I can' find, notwithstanding the references are many, is that of Grotius, (B. 3, cap. 2, sec. 5,) and his commentators, and it appears to me rather to oppose than to affirm the doctrine. His words are, “ That in doubtful cases, the presumption is in favor of the judges established by public authority; but in a case admitting" of no doubt, where sentence shall pass plainly against right, it is a just cause of reprisal, for that the authority of the judge is not of the same force against strangers, as subjects.”
Park, in his comment on the cases above cited, observes, that if the sentence be so ambiguous and doubtful, that it is difficult to say on what ground the decision turned; or if there be color to suppose, that the court abroad proceeded [*350] upon matter not relevant to the point in issue, "'evidence will be allowed, in order to explain; and if the sentence on the face of it be manifestly unjust, or founded on ordinances which form no part of the law of nations, it is a risk within the policy. With these qualifications, the rule that where the foreign sentence appears tobave proceeded on the point in issue between the parties, or is general without any special ground being stated, it shall conclude the question of neutrality, though not perfectly unobjectionable, is less liable to exception.
To apply it, thus qualified, to the case before us. No reason is. here assigned in the sentence, for the condemnation. But looking into the testimony on which the sentence is grounded, we. find abundant reason to suppose, nay, I may say conclusive evidence, that the foreign tribunal proceeded on matter not relevant to the question of neutrality. If we are to respect these foreign adjudications, and to presume that they are agreeable to the jus gentium if we are to believe that an American citizen, in a British provincial court of vice-admiralty, in a controversy with a British subject, *421 where too often the judge is a party in the cause, will meet with impartial justice,- we must suppose that our laws and our regulations will be also there respected. According to the laws of the United States, this ship was, to e„very intent, American, and the evidence of her being so was'fully before the court of vice-admiralty. To that court were produced, her register, which was American, and in the name of the plaintiff only ; a sea letter, granted by the president of the United States, accompanied by certificates from the Dutch, Spanish, French, and English consuls, declaratory of the voyage, and the articles ori board; a clearance from the custom house at New York; a passport declaring her American, signed by the president of the United States, and countersigned by the secretary of state, and the collector of the customs at New York; a roll of the crew, from which it appeared that all, except three, were native Americans; and lastly, the testimony of. the master and mates, that she had none but American colors., Can we suppose that a judge was to *be found, in any civilized country, [*351] who in the face of such testimony, uncontradicted, would say this was enemy’s property 1 In justice to a judge who could pronounce such a decision, we must conclude that his opinion was founded on the extra bill of lading, mentioned in the other cause of Goix v. Knox, to which we are referred, and, therefore, the question of neutrality is not affectedrby it. It is evident that the annexation of this bill to the affidavit and invoice, was the effect of mistake, and considered under all its circumstances, by no means fell under the description of false or colorable papers. But had the fact been otherwise, as they respected a portion of the cargo only, amounting to little more than half its value, there is no principle of the law of nations, or of the maritime law of Great Britain, by which such a circumstance can. be extended to affect the. ship so as to render her a lawful prize. The court of vice-admiralty, therefore, proceeding on this ground, has manifestly erred, and such error is a risk within the policy.
My opinion, therefore, is, that the postea must be delivered to the plaintiff.
*422 Lansing, Ch. J.. Two points have been presented for the decision of the court.
1. Whether the description, contained in the policy, “ the American ship called the Minerva,” is, in construction of law, a warranty that she was American property 1
2. If it is a warranty, whether proof is now admissible, notwithstanding the condemnation, that the vessel was American 1
The description of the 'subject insured is an essential part of the policy. An untrue description may tend to mislead, and induce an unfounded estimate of the risk, intended to be insured against. The notes in the margins of the policies in the case of Pawson v. Watson, (Cowp. 785,) and Bean v. Stupant, (Parke, 322,) were construed warranties, solely on the ground of their being considered p*art of the policies. It would seem that it is to be inferred -from those cases, that every description of the subject insured must be [*352] strictly and *literally true, for so is the doctrine of warranty,.and that, if it is not perfectly correct, the policy, as in the case of all other warranties, is void ab initio.
The construction that every description, importing a designation of the condition of the thing insured, as distinguished from, and added to its mere identification, should be deemed a warranty, would, perhaps, be more conformable to the general scope of the authorities on this subject, though I have not been able to discover any instances in which that, distinction has been specifically taken. But whether the word American is classed among the phrases constituting a warranty, or its insertion is to be considered as the mere effect of representation, will not vary the result in this case. A rigorous attention to the purest rules of good faith is exacted from all the parties to a contract of insurance; but warranty is tested by the positive stipulation of the party. The insured stipulates, that a fact exists, that a certain thing is done, and if he fails in maintaining his warranty, the policy is void: but if a representation is substantially true, it is held to be sufficient.
If the word American has been inserted from the represen *423 tation of the insured, and so I think must be the construction, and the property is not so, the defendant has been misled : he has estimated his risk, and of consequence received a premium, on the circumstance of its being American property, as contradistinguished from that of the citizens or subjects of the belligerent, or of other powers who remain neutral. Independent of this representation, the risk would probably have been estimated as arising from the greatest portion of it which could have attached to the ship wherever the property might be vested; as if no disclosure had been made of its precise condition, it might have been the property of a Spaniard, an Englishman, or a Frenchman, and subject to all the risks to which that condition exposed it, as the property of belligerents. I take it, therefore, without determining or giving my opinion whether this description constituted a warranty, that if it should appear that the property of the ship *was not American, but the proper- [*353] ty of belligerents, that the plaintiff ought not to recover. '
But it is insisted, that the case of Ludlow v. Dale, put the second question at rest, and that the sentence must preclude the plaintiff from proving that the property of the ship was as described in the policy. It is not a novel doctrine that the sentence of a court of competent jurisdiction, deciding on the subject in controversy, shall conclude on every point directly tried in the cause. As applied to this case, it is not necessary to resort to the fiction that all the world are parties to an admiralty cause. ■ The insured was emphatically a party. If he has entered into a'warranty that'his ship is neutral, or represented her to be so, it is peculiarly his duty to vindicate his allegation before a tribunal, in which it is a precise object of inquiry, and which is competent to decide upon it. He has in effect exempted the risks attached to the ship from its being considered as enemy’s property, out of his policy. If he has omitted to furnish the evidence of the neutrality of the ship, which he was or ought to be possessed of, it is to be attributed, as far as it respects the present parties, exclusively to himself; and, having had an oppor *424 tunity of vindicating it, he ought not to be permitted to de-. volve the consequence of his inability or disinclination to maintain it on the insurer.
The inference that the ship was condemned as enemy’s property is not, however, to be made from the express terms of the sentence, and I have doubts whether a presumption that it was on that ground can be rationally made.
I concurred in the opinion given in the case of Ludlow v. Dale, in which this point was decided; but upon a'review of that case doubts were excited, which my reflections have not removed : these 1 conceive it my duty to express, and I. am happy the question is again presented, whether the new point of light in which it is- placed, tends to correct the opinion formerly given, or to confirm the authority of that case. ■
[*354] ^Several cases were cited as supporting that opinion.
The case of Fernandes v. De Casta, (Park, 177,) in which the ship insured was warranted Portuguese. She was condemned as not being, or under pretence of her not being Portuguese. Lord Mansfield observes, that as the sentence is always general, without expressing the reason of the condemnation, attested copies of the libel ought in strictness to have been produced, to show on what ground the ship was libelled; but he adds, “ as the plaintiff has, by his answer in chancery, admitted that she was condemned as not being Portuguese, when added to the expression used in the sentence of condemnation, that the ship was condemned in the court of prizes, there is sufficient evidence for us to proceed upon.”
Here the plaintiff’s answer was admitted in aid of the general expressions in the sentence, and it. appears that the court were inclined to seek for the reasons which dictated it, in the libel.
The case of Bernardi v. Motteaux, (Doug. 575,) arose on an insurance on freight and goods, upon a ship warranted neutral, -and the property neutral. It appeared that the ship was captured by a French frigate ; that the plaintiff offered *425 to give evidence at the trial, that the ship was neutral, and that the papers belonging to it fell overboard by accident, The sentence stated that the goods going to an enemy’s country and. the loss of papers, had raised suspicions, and that she had been stopped, and it declared both ship and cargo good prize. The question arose whether this sentence was conclusive.against the insurer. Lord Mansfield observes, it is difficult to discover what the ground of this sentence Was. He inclined to think the court went upon the ground of enemy’s property, and considered the want of papers as a strong presumption of that fact. He concludes upon the whole, that enough did not appear on this obscure sentence, to ascertain precisely on what it was- founded, and some other method ought to be taken to inquire what the ground of it was. In this opinion, Willes, J. and Ashhurst, J. concurred.
*On the second argument, Lord Mansfield again [*355j observes, that without the proces verbal, the sentence was equivocal. -The opinion of the court was, that the sentence was ambiguous, and, therefore, not conclusive; and on that ground, judgment was given for the plaintiff. Upon Mr. Lee’s urging the danger of opening foreign sentences, and “ that in all cases of this sort, there would be controversies about the ground of foreign sentences,” Lord Mansfield replied, “ that this inconvenience would be entirely obviated, if the foreign courts would say in their sentences condemned as enemy’s property.”
The proces verbal is set forth, which is merely a history of the capture, and the circumstances attending it, after which the sentence is introduced with the word, “the premises considered.” It contains no ground of adjudication, and the court suggest that the inconvenience arising from this circumstance, might be avoided by stating the reason of the condemnation specifically.
The case of Barzillay v. Lewis. (Parky 358,) arose on a policy on a ship warranted Dutch property. The ground of adjudication in that case was pointedly, that it appeared that the ship was English and not Dutch property.
*426 The case of Saloúcci v. Woodmass, (Park, 362,). as stated in Park, arose upon a policy of insurance on goods warranted neutral, on board the Tuscan ship Thetis, The ship was taken by the Spaniards, and condemned as good and láwful prize, There was an appeal, upon which the sentence was reversed/,; and upo'n a further appeal, the first sentence was sustained. At the trial of the cause, Lord Mansfield was of opinion, that the sentence of the Spanish court of admiralty was conclusive evidence of the falsehood of the plaintiff’s warranty, and the plaintiff was nonsuited. A motion was made to set aside the nonsuit, and denied by the whole court. Lord Mansfield, in giving the opinion of the court on this, motion, says, “it must be presumed from the condemnation, as no other cause appears, that it proceeded ort the ground of the property belonging to an enemy.. In the case of Bernardi v. [*356] Motteaux, *the decision of the court turned upon the particular ground of the confiscation appearing on the face of the sentence, and that it did. not appear to be on the ground of its being ehemy’s property. This being so, the court gave the party an" opportunity to show by evidence that the specific ground was really the cause of condemnation. In this case- at Guildhall, the counsel admitted the general rule; but they said if a- copy of the proceedings could be had, a special cause would appear. The proceedings!are now come, and from them it appears, that the question turned entirely upon the property of the goods; for in the second court, to'which they appealed from the sentence, the question Was,- whether - the goods were free: the decree was. that they were.” He concludes, “ it is sufficient that no special ground is stated, and therefore the rule must be discharged,” We find in these cases, the court seeking for some explanatory circumstances, in aid of the general declaration, that the subject captured, was good and lawful prize, as a reason for presuming it to be grounded on the fact of its being enemy’s property. This consideration simply, must inspire some degree of doubt, whether it could be the intent of Lord Mansfield thus lightly and without animadversion, to shake a doctrine fully brought into view in the case of *427 Fernandes v. De Costa, and after a lapse of at least sixteen years recognized by the same tribunal in which he had continued to preside during the-whole of the intermediate time.
The case is stated in general terms ; but it appears that there had been successive appeals; that the question whether the property was free, had been agitated in the conrt of admiralty; and it is highly probable, that some circumstances to warrant a presumption that it was determined on that point, might have been developed. This presumption is corroborated by the expression Lord Mansfield uses, as no other cause appears, as, the reason for the presumption.
*There may, probably, have been some indica- [*357] tions. in the proceedings in the first instance before the court, of the real situation of the process in the admiralty court, which the court were possessed -of before the suit was finally determined. After observing on the progress of the appeals, that the question was, whether the goods were free, Lord Mansfield concludes, “ it is sufficient, however, that no special ground is stated, and, therefore, the rule is discharged.”
But if the question was whether the goods were free, there certainly appeared to be a ground for the decision in the determination against it, though it was not specially stated. -
The other construction Of this case, I take to be, that the court concluded, that the question of neutrality had been before the courts original and appellate, as a precise object of inquiry, and this being So, and no special ground being stated from which it could be inferred that the condemnation was on another ground, the court of K. B. suffer 'the generaVprinciple deducible from those proceedings to govern the case, and decided accordingly.
The casé of Calvert v. Bovill, (7 T. R. 523,); was on a policy of insurance on goods warranted American. It was proved on the trial, that the property corresponded with the warranty. The goods insured had been declared good prize.
It appeared that the reasons for the condemnation were, *428 “ because the true destination of the vessel in which they were laden was bound for an English island, having been hired and loaded in London, and that there had been found on board of her eighty barrels of gunpowder.”
That the ship and cargo were American was not questioned ; but it was contended, that though the fact was so, the sentence of condemnation precluded the plaintiff from asserting the fact. The court examined the reasons, and because those expressly given for the judgment, led to a contrary conclusion, they decided that it could not. be on the ■ ground that it was British property. Lord Kenyon expressly refers to and yields to the doctrine, in the cases [*358] *of. Saloucci v. Johnson, Mayne v. Walter, and Saloucci v. Woodmass.
The case of Saloucci v. Johnson, (Park, 415,)-appears to have arisen on a policy on the same ship Thetis, on which the case of Saloiicci v. Woodmass arose. It appears that the ship was condemned for .resisting a search, and for not having a charter-party on board. The appeals are stated as in the other case: but it appears that the last sentence admitted the ship to be neutral.
It was admitted that a ship warranted to be neutral must be so conducted as not to forfeit her neutrality, But the court determined that the act of search is always the effect of coercion, and may always be resisted when the party is able; and that this did not forfeit her neutrality.
The doctrine of Lord .Mansfield in the case of Saloucci v. Woodmass, is inconsistent with that laid down in the case of Bernardi v. Motteaux, and that of Fernandes v. De Costa. In the two last cases, the aid of collateral circumstances was admitted to give a construction to the generality of the sentence, such as the matter disclosed in the answer to a bill in chancery, and the import of the libel. The general doctrine is admitted by the counsel in the case of Saloucci v. Woodmass, where the general doctrine was laid down; but what circumstances prompted the admission, or ryhat was the extent of it, is not precisely stated in the case.
*429 If peculiar circumstances did not exist, it is difficult to reconcile the more recent decision of the court of king’s bench, to the principle alleged to have governed in the case df Saloucci v. Woodmass. In that cáse, the goods insured were warranted neutral, and Lord Mansfield held, “ that it must be presumed from the condemnation, as no other reason appears, that it proceeded on the ground of the property belonging to the enemy.”
I cannot satisfy myself on what ground this presumption ought to prevail in preference to any other. The opinions of Lord Mansfield merit, and will always command *a respectful attention; but at a period when they [*359] cease to be binding as authority, 1 can follow them so far only, as they tend to convince my mind that they are correct.
The rules applicable to this question, as laid down by Lord. Mansfield, seem to be, that if- it appears that the condemnation was expressly on the ground that the property insured was enemy’s property, it shall conclude; that if the grounds are set forth, they are examinable; but if the sentence is si- " lent as to the reasons, though it is admitted, that there are cases in which an examination may be proper, the presumption is, that the condemnation was on. the ground of its being enemy’s property, and of consequence, the reasons presumed being the strongest- possible against the insured, it must also conclude him. This is established on the courtesy which ought to prevail between different courts 5 but certainly the courtesy is carried beyond the necessity which dictated it. All that can be required is a presumption, that their proceedings were warranted on some ground arising from local regulations, or from the general maritime law; and it does not follow, that because the sentence is silent as to both, that the condemnation is to be attributed exclusively to one of them.
On the whole, therefore, I am of opinion, that the plaintiff is entitled to recover.
Judgment for the defendant.(a)

 See 3 Bos. & Pull. 201, 506, 514, 515, 531. 6 East, 382.